Loren Ouellette
Gayla Ouellette
11519 Pepper Wy.
Reno, NV 89506
Telephone: (775) 830-3260
Facsimile:  (775) 345-3282
Email: nutrend@yahoo.com

PLAINTIFFS IN PRO PER

☑ FILED     RECEIVED
___ ENTERED     ___ SERVED ON
COUNSEL/PARTIES OF RECORD

JUN 2 4 2020

CLERK US DISTRICT COURT
DISTRICT OF NEVADA
BY:_____DEPUTY

**COPY RETURNE**

# UNITED STATES DISTRICT COURT

# FOR THE DISTRICT OF NEVADA

|  |  |
|---|---|
| GAYLA OUELLETTE, an individual, LOREN R. OUELLETTE, an individual, <br><br> Plaintiffs, <br><br> *vs.* <br><br> SPECIAL RECREATION SERVICES, INC., a Nevada Non-Profit Corporation, dba AMPLIFY LIFE; STEPHANIE RICE, CYNDY GUSTAFSON, DIANE THORKILDSON SHANNON DRESSEL, ALAN HERAK , AMY GARLAND and DOES 1-50, inclusive. <br><br> Defendants. | Case No.  3:20-cv-00391 <br><br> VERIFIED COMPLAINT FOR: <br><br> 1  VIOLATIONS OF 42 USC § 12203 <br> 2. WRONGFUL TERMINATION <br> 3. FRAUD <br> 4. DEFAMATION <br> 5. CONVERSION <br> 6. UNJUST ENRICHMENT <br> 7. FRAUD AND DECEIT <br> 8. VIOLATIONS OF 18 USC §1030 <br> 9. DECLARATORY JUDGMENT <br><br> **JURY TRIAL DEMANDED** |

Paid Amt $ 400⁰⁰ Date 6/24/20
NVRNO-
Receipt # 4998 Initials AB

OUELLETTE CIVIL COMPLAINT
Case No.

# COMPLAINT

PLAINTIFFS, GAYLA OUELLETTE and LOREN OUELLETTE in Pro Per files this Verified Complaint against all named DEFENDANTS and are informed, believe and thereon allege that each of the Defendants named herein as DOES are the agents, employers, representatives, successors in interest, or employees of the other named Defendants, and when performing the acts alleged herein, were acting within the scope of their agency, employment, authority, and or/representative capacity, and are therefore responsible for the acts complained of herein. Plaintiffs are informed, believe, and thereon allege that each factiously named Defendant is responsible in some manner for the occurrences alleged and Plaintiffs' injuries and damages as herein alleged are directly, proximately, and/or legally caused by defendants and all of their acts. Plaintiffs will seek leave of court to amend this Complaint to set forth the true names and capacities of such named Defendants when their identities become known to PLAINTIFFS.

# THE PARTIES

1.      GAYLA OUELLETTE and LOREN OUELLETTE (hereinafter "PLAINTIFFS" or "GAYLA" or "LOREN") are individuals residing in Washoe County, Nevada in the State of Nevada and brings this claim against SPECIAL RECREATION SERVICES, INC., a Nevada Non-Profit Corporation, dba AMPLIFY LIFE (hereinafter "Amplify Life"); STEPHANIE RICE ("Rice"), CYNDY GUSTAFSON ("Gustafson"), and DIANE THORKILDSON ("Thorkildson"), SHANNON DRESSEL, ALAN HERAK ("Herak"), AMY GARLAND and DOES 1-50, inclusive. (hereinafter "DEFENDANTS")

# JURISDICTION AND VENUE

2.      This Court has original jurisdiction over the subject matter on this case pursuant to 42 USC § 12203 and has supplemental jurisdiction over the related state and common law claims pursuant to 28 USC §1367 and upon information and belief Venue is proper pursuant to 28 U.S.C §§

1391(b) and (c) as the Defendants are doing business in this district and a substantial part of the

events giving rise to the claims alleged herein occurred in this district and that the damages inflicted

sustained occurred in this judicial district.

## ALLEGATIONS COMMON TO ALL COUNTS

3.   This case involves the rights and protections under the Federal Whistleblower Protection Act

of 2019 in which an employee reasonably believes that a law, rule or regulation has been violated in

accordance to the Congressional Accountability Act of 1995 that expressly prohibits retaliation where

no employer may discharge, demote, suspend, threaten, harass, directly or indirectly or in any other

manner discriminate against a whistleblower because of a lawful act done by the whistleblower or

whistleblowers.

4   At all times material GAYLA OUELLETTE (hereinafter referred to "GAYLA") was hired by

SPECIAL RECREATION SERVICES, INC., (hereinafter referred to "Amplify Life") then also

known as Camp Lotsafun, as its Director of Marketing, Public Relations and Fundraising. Her

employment dates were June 1, 2013 through January 23, 2019. PLAINTIFF GAYLA OUELLETTE

was specifically recruited to make the 39-year-old nonprofit sustainable.

5   Camp Lotsafun was a nonprofit summer recreational camp for a small number of people with

special needs. Today the nonprofit is known as Amplify Life and serves hundreds of people of all

ages with developmental and intellectual disabilities each year, through a diversified portfolio of

recreational, educational, and social programs, and their caregivers and families through respite.

6   At the time of her hiring GAYLA was offered compensation which included an incentive

bonus plan the Board of Directors (hereinafter "the Board") was responsible for developing and an

Individual Retirement Account ("IRA").

7   At all times material GAYLA OUELLETTE was given the title of 'Interim Executive

Director', on or about October 2013, when the Board asked her to assume the role and additional

responsibilities that came with it, at which time she was given a $23,000 salary adjustment. On or

about December 2013, she was given the permanent title of Executive Director, as she agreed to

assume the role permanently.

OUELLETTE CIVIL COMPLAINT
Case No.

8    Upon assuming the role of Executive Director, GAYLA discovered the nonprofit was being mismanaged by its Board. Amplify Life had allowed a seated board chairman, a Morgan Stanley Broker, to personally manage and profit from Special Recreation Services once sizable investment account. Amplify Life was burning through financial resources at an alarming speed and with resources to last about 18 months if they continued business as usual. Amplify Life was running camps it could not fiscally sustain. The Board was violating California State payroll laws where summer camps were held by paying camp counselors substandard wages, requiring them to work too many hours, failing to pay for hours worked and overtime, and failing to provide proper breaks. The Board were ultimately responsible for the nonprofits welfare but were disconnected from the daily operations.

9    GAYLA OUELLETTE ascertains that in signing the Amplify Life Non-Disclosure Agreement (hereinafter "NDA"), all members of the Board of Directors also hold a position of special trust and confidence. The Board members are also bound by duty to the organization and staff who bring forth legitimate concerns for the welfare of those the nonprofit services.

10   During her service as Executive Director, GAYLA OUELLETTE was responsible for all of the day-to-day operations. As an officer, GAYLA reviewed and signed contracts. These included Nevada State contracts with the Department of Employment, Training, and Rehabilitation (DETR) to run work training camps (hereinafter "Works Camps") for young adults with intellectual and developmental disabilities, which are Federally-Funded. GAYLA was solely responsible for developing, running, and hiring for the State Works Camps. GAYLA enjoyed outstanding professional relationships with her State partners. GAYLA was in regular contact with Walter Cuneo, Management Analyst and Division Contract Manager. At all times material GAYLA also had an exemplary relationship with Janice John, Deputy Administrator, DETR. During a meeting with GAYLA, Ms. John praised GAYLA for the high quality of work on the programs she created and ran under the State contract. According to Deputy Administrator John, GAYLA'S programs and reports are considered the "Gold Standard" for the State of Nevada.

11   At all times material, GAYLA was authorized to sign and approve contracts that financially bound the organization. Many of the contracts / agreements were without the Boards review while some were with the approval of one, two or three Board members. Contracts and Agreements signed by GAYLA from time to time, without board approval, totaled well over $40,000.00. GAYLA had

OUELLETTE CIVIL COMPLAINT
Case No.

previously held a senior marketing position within Charles River Laboratories, at that time a billion-dollar company, and managed portions of a multimillion-dollar marketing budget.

12   Upon information and belief working for a nonprofit is both physically and emotionally taxing with pay often not commensurate with experience. It is common practice that nonprofits are frequently dependent on the commitment of donors, family and friends in the quest to serve the community. DEFENDANT Amplify Life had a 15-year established history of family working together to advance the mission. This included high level staff, such as Amplify Life's Registered Nurse and her daughter, and others. The Board was aware that GAYLA'S family members also worked for Amplify Life.

13   GAYLA'S daughter Jillian Ouellette, a University of Nevada, Reno graduate in International Business and Marketing, devoted her services as a full-time employee to Amplify Life from 2014 to 2016 as Office Manager. The Board of Directors did not object to this type of arrangement. In fact, they encouraged it. In 2013, then Board Chairman Shannon Dressel suggested the nonprofit could greatly benefit from the Jillian's expertise and community connections and proposed she join the organization. The Board unanimously embraced it.

14   GAYLA'S spouse LOREN from time to time was one of many people Amplify Life employed over many years. When GAYLA first became Executive Director, LOREN a former Sr. Project Manager for a Silicon Valley tech company, was contracted by GAYLA, to manage the development of a complex customized website for Amplify Life. The website would be coded by a company in India under LOREN'S direction. When complete LOREN would transfer to Hostmonster, Inc. server and that is responsible for maintenance, security, and the hosting server. The value of the agreement with LOREN for these services was $24,000. Upon information and belief no money exchanged hands. As long as GAYLA remained with Amplify Life, the fee would be amortized over time. LOREN would retain custody of the site until the agreement termed. Shannon Dressel instructed GAYLA to "just get it done".  Loren also assisted with the Works Camps and was crucial because his experience exceeded the State requirements his presence was paramount to the safety and welfare of clients and staff.

15   In March of 2018, the Board (Gustafson, Thorkildson, and Bill Wagner) approved LOREN to work for Amplify Life on a building restoration. Due to the nature of this work, they also agreed to

OUELLETTE CIVIL COMPLAINT
Case No.

provide workers compensation insurance to LOREN, as was common practice for Amplify Life with camp counselors.

16  Between March 2018 and November 2018, LOREN performed extensive work for Amplify Life. The work was part of a colossal undertaking by the nonprofit to transition the organization from the 1,400 sq. ft. Hubbard office to the 12,500 sf facility located on the Northern Nevada Adult Mental Health Services (NNAMHS) campus, at 480 Galletti Way, Bldg., 2, Sparks, Nevada. The building was severely neglected and dilapidated, requiring extensive improvements and cleaning before the nonprofit could occupy the space and utilize it for programs.

17  During this time period LOREN worked nonstop on the building on a 24/7 basis. There was an enormous amount of refurbishment to complete to prepare the facility for the State-funded DETR programs the nonprofit was committed to run in June 2018. DEFENDANT Gustafson was also aggressively pushing for a grand opening to impress individuals within the Department of Health and Human Services she worked with through her personal consulting business, Strategic Progress LLC. LOREN was initially provided with a small payment for his services. DEFENDANTS Gustafson and Board members promised LOREN proper compensation would be forthcoming. LOREN continued to work based on these assurances. The work performed by LOREN in this capacity was an estimated $125,000 in value. Yet, the only compensation he ever received was an initial payment of $1,600.

18  In May 2018, GAYLA became concerned with the lack of safety and the unhealthy conditions for the disabled individuals the nonprofit served at the facility, as well as for her staff. There were often bloody rags and soiled clothing around the building, along with used heroin needles and drug paraphernalia in the grass of the Amplify Life courtyard where clients and staff frequented. Drug addicts regularly accessed the Amplify Life courtyard where they would shoot up. GAYLA would have to check the grass and surrounding areas of the courtyard prior to programs.  Mental health patients and transients were a constant problem on the campus and knew the building as it had formerly been the State NNAMHS Drop-in Center. They would urinate, defecate and vomit in the area. At one point, GAYLA requested the campus properly clean the area, which they reluctantly agreed to. On two separate occasions, GAYLA was notified by the campus security that *homicidal* patients had escaped holding detainment in Building 1 on the NNAMHS campus. Amplify Life occupied Building 2. GAYLA was instructed by Danny, a contracted security guard for the campus who knew Amplify Life served an "at-risk population" close to windows and blinds, lock all doors

OUELLETTE CIVIL COMPLAINT
Case No.

and remain inside until he gave the "all clear". On one of these occasions a federally-funded Works Camp was in process with 15 special needs individuals and 14 staff present.

19  GAYLA further alleges employees consistently found weapons in the courtyard and around the building. There were numerous Health and Safety violations in the building and on the campus that needed to be corrected. Also, parents and caregivers of disabled clients of Amplify Life contacted GAYLA with their safety concerns.  GAYLA raised these concerns with the Board.

20  About June 2018, with health and Safety matters escalating and the board taking no action, GAYLA spoke to Christina Brooks, Agency Director of the NNAMHS campus. When DEFENDANT Gustafson learned of this, she forbade GAYLA to speak with Brooks further.

21  In November 2018, a homeless woman gained access to the facility while a large program with 30 special needs clients was underway. GAYLA was able to get the delusional woman who was sequestered in the ladies' restroom with five special needs girls and a counselor, to exit the building without further incident. But it was highly concerning and frightening to GAYLA and her staff who were involved.

22  When GAYLA brought these concerns to the attention of the DEFENDANTS Gustafson and the Board they were largely ignored. With one exception, during a November Board Meeting, DEFENDANTS the Board voted to allow GAYLA and two other staff to carry pepper spray while working. However, that was the extent of any action on the part of the Board.

23  Gustafson told GAYLA the matter must be handled cautiously and she (Gustafson) would handle it. This was due to Gustafson's personal consulting business, Strategic Progress, LLC, did most of its business with the State. Gustafson also implied GAYLA could face reprimand from State authorities for raising concerns about campus issues if not handled delicately. Gustafson said she would speak with Richard Whitley, the Director of Nevada State Health and Human Services, who was responsible for providing Amplify Life with the building.

24  After growing increasingly concerned by the inaction of Gustafson and the Board, in December 2018 GAYLA made reports to several more agencies and persons outside the Board of Directors and Amplify Life.

25  GAYLA was eventually forced to take the above safety issues to the Nevada State Capitol Police Chief and the Nevada State Fire Marshal. These officials agreed the area was not safe for

OUELLETTE CIVIL COMPLAINT
Case No.

people with special needs and staff and offered to help locate another State of Nevada building for Amplify Life to operate in safely.

26  GAYLA also reported it to Richard Whitley. Whitley stated that Gustafson never contacted him concerning Amplify Life health and safety issues. Whitley was deeply concerned and said had he been contacted he would have helped to resolve the issues immediately. Whitley initiated a State investigation into the matter.

27  Further, GAYLA discussed safety issues with OSHA State and Federal.

28  Despite the promises made at the time of her hiring, GAYLA had never received her incentive bonuses as promised in her hiring contract, nor was she provided with an IRA the Board had promised her. GAYLA repeatedly requested the Board honor their promises.  DEFENDANTS repeatedly assured GAYLA that they would resolve the issue at the next Board Meeting. The topic was continually pushed to the next meeting's agenda and frequently forgotten by them. At one point, Board member Bill Wagner was so frustrated over the Boards lack of action he took it upon himself to meet with an investment company to work up details to get an IRA established for GAYLA. His calls to address the matter of GAYLA'S retirement went unanswered by the BOARD. GAYLA was never told she would not receive these items.

29  During her tenure as Director of Marketing, Public Relations, and Fundraising, and later Executive Director of Amplify Life, GAYLA corrected many grave issues the BOARD had allowed to develop. She ensured that all programs were properly funded. She ensured counselors salaries were in compliance with payroll laws. GAYLA ensured that program staff were properly vetted and trained, and programs were sufficiently staffed. Further, GAYLA ensured that Amplify Life was fully compliant with all State requirements by working closely with Walter Cuneo. GAYLA'S success running these programs initially resulted in the State extension of the Federally-funded contract from $50K to $350K, and finally in Walter contacting GAYLA to extend the offer of a Master Service Agreement, which would allow the State to provide ongoing funding to Amplify Life.  Under GAYLA'S leadership, DEFENDANT Amplify Life thrived and prospered as never before.

30  On November 10, 2018, the Board gathered at the Galletti facility to review Amplify Life's performance. Fiscal Year 2018 was the most profitable and accomplished year on record for the now 44-year old nonprofit. GAYLA demonstrated repeatedly she was a qualified and consummate

OUELLETTE CIVIL COMPLAINT
Case No.

professional, delivering on every task established, while she waited for the Board to deliver on their perpetual promises of a retirement and incentive program.

31  Following this meeting GAYLA requested Gustafson remain behind to meet with her privately about some pressing matters. GAYLA shared with Gustafson she learned that Board member Alan Herak had been accused of embezzling by a former employer. To avoid prosecution, Herak agreed to pay the money back. While this occurred prior to GAYLA joining Amplify Life, she expressed this could have serious ramifications to the nonprofit with funders, the likes of Nell J. Redfield, E.L. Cord and Pennington Foundations, and the May and Stanley Smith Trust. Herak also held the position of Secretary/Treasurer nonstop since shortly after he joined the Board some 11 years prior.  GAYLA and Gustafson also briefly discussed GAYLA'S outstanding retirement and incentive plan. Gustafson told GAYLA that she needed some time to figure things out but she would handle these matters.

32  At the December 12, 2018 Board meeting, it was announced that Amy Garland would assume the role of Amplify Life Secretary/Treasurer. Alan Herak would remain as a Board director. GAYLA had a major surgery scheduled for December 18, 2018. The Board assured GAYLA they would take care of anything in her absence.

33  About this time, GAYLA and the Board discussed the creation of official procedures, as none existed beyond the Paychex employee manual related to employees and residential camps. Procedures in the current manual created by Paychex are intentionally vague to limit any liability on the part of the organization. The catalyst to creating the procedures was in large part, due to Amplify Life receiving a sizable state contract with Federal funding, and GAYLA had made it clear that the Board of Directors must participate moving forward.

34  GAYLA and Garland, the new Amplify Life Secretary/Treasurer, planned to sit down and review financial processes and evaluate what additional procedures were necessary. They agreed this would occur when GAYLA returned to work. GAYLA'S recovery time was expected to be 8 weeks. At this time the Board was aware GAYLA would be unavailable until at least mid-January 2019, possibly longer.

35  While GAYLA was out of the office on medical leave in December 2018 DEFENDANTS Gustafson, Rice, Thorkildson, and Garland went to the Amplify Life office unannounced. Even other Board members did not know they were going. These individuals later disclosed the purpose of their

visit was to review company files to assess the various types of procedural requirements the nonprofit should put into place.

36  Meagan Meresz, Amplify Life Program Coordinator, was the only staff present. Recently hired full time, Maegan was not aware of where to locate many of the files the Board members were seeking. Cindy Prescott, former Amplify Life Office Administrator, who had resigned in October 2018 citing the challenges of the job were too stressful, was still working from time to time helping with office filing. Prescott had maintained many of the sought for files in her previous role as Office Administrator. However, Prescott was not in the day the Board members stopped by. Their visit to the office to review files was impeded by the fact that neither GAYLA nor Prescott was present to show them the requested files.

37  GAYLA was never advised of concerns over financial irregularities or compliance issues, and nor should she have been. The Board members were solely responsible for processes and procedures of Amplify Life.

38  January 2, 2019, DEFENDANT Gustafson emailed GAYLA wanting to know the date she would return to work. Gustafson reminded GAYLA the board approved two weeks paid leave. Consequently, the Board had no policy on medical leave. Gustafson told GAYLA the BOARD needed to know when she would return to work because they needed to set up a meeting with her and the Executive Committee (DEFENDANTS Gustafson, Thorkildson and Garland) for the day of her return. GAYLA replied that Rice told her she could not return to work without a doctor's note. GAYLA would not know until her post-op appointment with the surgeon on January 8, 2019. GAYLA felt enormous pressure from Gustafson to return to work prematurely.

39  In the days prior to GAYLA'S surgery, the Board had demonstrated many peculiar behaviors. Rice asked GAYLA for passwords to certain company accounts. Once provided, the passwords would change, locking GAYLA out of accounts and leaving her unable to take care of company business. When GAYLA asked Rice and Gustafson about this, both denied making password changes. GAYLA was deeply concerned the accounts had been hacked, causing her to suffer extreme anxiety attacks. One of these password changes to Amplify Life's PayPal Account occurred the night before GAYLA'S surgery, resulting in her having an anxiety attack and asking Bill Wagner to get involved and handle it.

OUELLETTE CIVIL COMPLAINT
Case No.

40   On January 4, 2019, there was a meeting scheduled with the State Fire Marshal concerning safety issues at the nonprofit building. Discussions concerning health and safety had been ongoing for months between GAYLA and Gustafson and the Board. GAYLA notified the boards of this meeting and requested one or more attend in her absence due to she was on medical leave. On the day of the meeting GAYLA had not heard from any of the Board. GAYLA had LOREN drive her to the campus, arriving late but in time to catch Bart Chambers, Nevada State Fire Marshal and representatives from the State Capitol Police and Public Works Department who were leaving. These officials agreed the area was not safe for people with special needs and staff and offered to help locate another State of Nevada building for Amplify Life to operate in safely. Following this brief encounter, GAYLA advised the Board she spoke with them. She also advised them Fire Marshal Chambers was going to schedule an official inspection to take place to address all of the concerns GAYLA had raised.

41   January 8, 2019, GAYLA had her 3-week post op appointment with her doctor. GAYLA'S surgeon instructed her to be off work for 8 weeks. GAYLA told the doctor she did not feel she could be off work for that long because there was no one to run the nonprofit. GAYLA had been told by the Board they would handle things in her absence. However, this had not been the case. GAYLA'S doctor agreed to provide a note allowing her to return to a highly modified work schedule and GAYLA agreed to work from home as much as possible. He would reevaluate a final release at her 8-week post-surgery appointment.

42   About this time, an official inspection with State Safety Officials took place. GAYLA was present, as was LOREN. No one from the Board attended. Amplify Life was advised that a number of health and safety issues must take place and programming with the special needs clients should cease until those issues were resolved. GAYLA notified the Board of this.

43   Immediately after, Gustafson sent an email to the Board suggesting the facility was as safe as Disneyland, thereby delegitimizing the authority of the State Fire Marshal and Capitol Police Chief.

44   About this time, Gustafson began harassing GAYLA, repeatedly demanding she call her. At one point she said GAYLA was insubordinate for not calling her. GAYLA reminded Gustafson she was still under medical restrictions and not released to work full time.

OUELLETTE CIVIL COMPLAINT
Case No.

45  January 11, 2019, GAYLA was working from home but felt obligated to attend The Sheep Dip, a fundraising event which Amplify Life had been named the recipient of events proceeds. GAYLA was accompanied by approximately 20 of the nonprofits special needs clients. LOREN and several volunteers attended to help.  None of the Board attended that night.

46  January 17, 2019, Gustafson scheduled a meeting between GAYLA and the Executive Committee requiring GAYLA to come into the office. Gustafson said the meeting was to develop procedures. This was the same meeting Gustafson had been so desperate to schedule; she emailed GAYLA 15 days after her surgery. The meeting was attended by Gustafson, Thorkildson, and Garland, and began as a discussion of procedures. When Meagan Meresz, the Amplify Life Program Coordinator returned from lunch, Gustafson said she wanted to move the meeting somewhere more private. The meeting was moved into the gym, where once seated Gustafson and Thorkildson launched into a verbal attack on GAYLA. The women were extremely displeased with GAYLA'S insistence something be done about health and safety at the new facility, and that she wanted the Board to participate. Thorkildson told GAYLA they were the Board, she worked for them, and didn't tell them what to do. Thorkildson also told GAYLA if she couldn't handle it, she could leave. GAYLA believed this also meant if she was afraid of the work environment, she should quit.

47  GAYLA became extremely upset and told them they were being very hostile. GAYLA cited their attack was on par with an incident from years earlier when then Board Chairman Shannon Dressel showed up at the office and when she became displeased with GAYLA, she leaned across the desk and put her fist in GAYLA'S face. This episode was witnessed by an employee. But when GAYLA brought it to the attention of the Board, attorney Rice disregarded it saying it was a 'she said, she said' moment and there was nothing the Board could do. Gustafson, Thorkildson, nor Garland were not on the Board at that time. The day after Rice sent that email, Dressel presented a letter of resignation, which Bill Wagner said Rice told her what to write during the Executive Session on this matter. Following Dressel's resignation, GAYLA having no desire to harm Amplify Life, set about serving the nonprofit without taking further action.

48  Further, GAYLA explained her concerns about health and safety were imperative to the welfare of Amplify Life and the welfare of its' at-risk clients. All officers of the nonprofit had a fiduciary responsibility to it. GAYLA told the Board that issues of cronyism and conflict of interests on the part of Gustafson and her business, Strategic Progress, LLC, posed an enormous threat to the

nonprofit. Gustafson gave Amplify Life business to her friends, in one case the nonprofit paying her friend $23,000 for grant writing that produced minuscule return. Gustafson, under her consulting business applied for and won a grant that claimed to benefit Amplify Life financially, but it did not. Thorkildson and Gustafson were combative and rejected the idea that GAYLA had any authority to tell the Board anything.

49  At the conclusion of this meeting, GAYLA was experiencing severe abdomen pain (at her surgical site). It resulted in GAYLA going to the Reno Hospital Emergency Room that night.

50  GAYLA initiated a Worker's Comp Claim, which was in process at the time of her termination. The Board fought the claim committing fraud by stating the meeting was not a Policy and Procedures Meeting, but an employee review. Yet there was no documentation as would be expected in such a case.

51  On January 23, 2019, GAYLA emailed the Board that she was not comfortable attending the Board meeting given the hostility demonstrated, suggesting it should be postponed and it would be prudent to involve an outside nonprofit professional to assist Amplify Life to address responsibilities, including the relationship between Executive Director and Board of Directors. Gustafson responded to all stating the Board had a matter to address and would go into Executive Session after a brief Board Meeting.

52  GAYLA was terminated in an email from Rice that night. GAYLA was 4-weeks into an 8-week recovery, and still under doctors' orders to work a modified schedule. The doctor had not released GAYLA.

53  Following GAYLA'S termination, even with their knowledge that GAYLA had recently undergone major surgery and was bedridden, DEFENDANTS continuously harassed GAYLA for the return of Amplify Life's property to their campus. At all times material, GAYLA reminded them that she was unable to leave her bed and offered to arrange for them to collect the items the next week. However, DEFENDANTS RICE (and the Board) ignored her and used her inability to return the property to file a police report claiming embezzlement, using false claims to have the report created.

54  Upon GAYLA'S request for her employment records as allowed by Nevada Law, there was a 20-day delay in receiving the file. On top of that, RICE sent GAYLA an incomplete file, which also contained a fictitious and an illegally altered document. The document indicated GAYLA was written up for insubordination, which led to the loss of a major donor. The document also tied GAYLA to

specific protocols she must follow or be terminated. The representations contained in this document are patently false. At all times material GAYLA was never written up for any reason, nor had any donor stopped its contributions. Further, the document contained GAYLA'S signature which was forged. Finally, the write-up was countersigned by Board member, namely, SHANNON DRESSEL, who had resigned 8 months prior to the alleged insubordination.

55  Upon GAYLA confronting the Board wanting to know who falsified a document with her name, Amplify Life sued GAYLA and LOREN OUELLETTE in the Second Judicial District Court of the State of Nevada, making fraudulent claims against them.

56  During this time, the Board made it known to contractors, vendors, state employees, and the public via a Sparks Police Report, that GAYLA was terminated for insubordination, and implied that she embezzled funds from Amplify Life as well. These false representations permanently damaged GAYLA's ability to find equivalent or better level of employment. Upon information and belief GAYLA's career and earning power was destroyed by this misinformation.

57  The Board told Gerald Smith, Esq., Trustee of the Nell J. Redfield Foundation, a $63MM funder, who had funded Amplify Life, GAYLA had stolen Amplify Life grant files. This information was disseminated among GAYLA'S nonprofit industry colleagues. This caused irreparable damage to GAYLA'S reputation, career and ability to earn a living. It is reasonable to assume other funders, including, but not limited to, Pennington, E.L. Cord Foundation and the May and Stanley Smith Trust who GAYLA may also have been told the same.

58  The Board shared confidential information with a low level employee. Namely, Cindy Prescott, who was hired back following GAYLA's termination. Prescott sent emails to numerous people divulging confidential information and disparaged GAYLA with many falsehoods initiated by the Board.

59  Amplify Life and Cindy Prescott misappropriated GAYLA and LOREN'S personal property. One example is a stained glass art hanging, that DEFENDANT AMPLFY LIFE placed up for auction. The art was featured publically online and consequently sold during Amplify Life's Grand Opening. It was list as being donated by Prescott. Meagan Meresz, who left the company following GAYLA'S termination, at the request of GAYLA had gathered her personal items, including numerous stained glass art pieces of great sentimental value to GAYLA and set them aside for her retrieval.

OUELLETTE CIVIL COMPLAINT
Case No.

60  At the time of GAYLA'S termination, LOREN was owed a prorated balance of $2,800 per the website agreement. DEFENDANTS Gustafson and Rice, an attorney, wrongfully accessed LOREN'S Hostmonster account by misrepresenting themselves as the site owners to gain control of the website. Once they had access DEFENDANTS changed all account information and passwords locking LOREN out of his account. Upon discovering DEFENDANTS had done this LOREN filed an ownership dispute causing Hostmonster to lock the site. But DEFENDANTS Gustafson and Rice had already downloaded a copy of the website without remunerating LOREN for his work.

61  On August 19, 2019, DEFENDANTS Amplify Life and the Board fraudulently gained unauthorized online access to GAYLA and LOREN'S Costco account and changed ownership and contact information.

62.  On August 20, 2019, DEFENDANTS Gustafson and Rice, an attorney, fraudulently gained unauthorized online access to GAYLA and LOREN'S Sam's Club Account and changed ownership and contact information.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

## FIRST CAUSE OF ACTION

(Retaliation for Whistle-Blowing in violation of 42 USC § 12203 GAYLA against AMPLIFY LIFE)

63.     PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

64. .   At all times material GAYLA was an employee of Amplify Life.

65.     GAYLA reported information or activity that was unsafe, illegal, unethical, or not morally correct within an organization to government officials and law enforcement agencies PRIOR to her termination.

66.     GAYLA is protected under Federal Whistleblower Act with protections, rights and remedies for from any kind of retaliatory action by her employer to deprive her of her rights or take any kind of disciplinary action against her based upon her whistleblowing conduct.

67.     Amplify Life terminated GAYLA in retaliation to GAYLA's reports of unsafe conditions to government officials.

OUELLETTE CIVIL COMPLAINT
Case No.

68.     As a proximate result of the wrongful conduct of Defendants, and each of them, PLANTIFF GAYLA has suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

69.     As a proximate result of the wrongful conduct of Defendants, and each of them, GAYLA has suffered humiliation, emotional distress, and mental pain and anguish in an amount according to proof at the time of trial.

70.     In doing the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously toward GAYLA with advance knowledge and conscious disregard of GAYLAS' rights, or the consequences; or did authorize or ratify such intentional, oppressive and malicious acts, with the intent of depriving GAYLA of property and legal rights and otherwise causing her injury. Because the acts taken toward GAYLA were caused by directors, officers, and/or managing agents acting in a malicious, oppressive, deliberate, cold, callous, and intentional manner in order to injure and damage, GAYLA therefore requests the assessment of punitive damages.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

## SECOND CAUSE OF ACTION

(Wrongful Termination — PLAINTIFF GAYLA against AMPLIFY LIFE)

71.     PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

72.     At all times material GAYLA was employed by Defendant Amplify Life from 2013 through 2019.

73.     During this time, PLAINTIFFS reported unsafe working conditions to local authorities after having reporting them internally.  GAYLA made reports through emails, telephone calls and in person which were initiated during her employment.

74.     On or about January 2019, GAYLA further alleges that as a result of her actions in reporting to outside agencies, after the Board of Directors failed to act, DEFENDANTS Amplify Life, Cyndy Gustafson, Stephanie Rice, Diane Thorkildson, and Amy Garland proceeded to conduct

OUELLETTE CIVIL COMPLAINT
Case No.

1   a campaign to rid their selves of GAYLA.  GAYLA was then wrongfully terminated from her

2   position for her actions as a whistleblower.

3       75.   As a proximate result of the wrongful conduct of Defendants, and each of them,

4   GAYLA has suffered and continues to sustain substantial loss in earnings and other employment

5   benefits in an amount according to proof at the time of trial.

6       76.   As a proximate result of the wrongful conduct of DEFENDANTS, and each of them,

7   GAYLA has suffered humiliation, emotional distress, mental pain and anguish all to her damage in

8   an amount according to proof at the time of trial.

9       77.   In doing the acts herein alleged, DEFENDANTS acted intentionally, oppressively, and

10  maliciously towards GAYLA with advance knowledge and conscious disregard of GAYLA's rights,

11  or the consequences to her; or did authorize or ratify such intentional, oppressive and malicious acts,

12  with the intent of depriving GAYLA of property and legal rights and otherwise causing her injury.

13  Because the acts taken toward GAYLA were carried out by directors, officers, and/or managing

14  agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage

15  GAYLA therefore requests the assessment of punitive damages in an amount to be proven at trial.

16      WHEREFORE, PLAINTIFFS prays for relief as set forth below

17  **THIRD CAUSE OF ACTION**

18  (Fraud — GAYLA against all DEFENDANTS AMPLIFY LIFE, STEPHANIE RICE,

19  CYNDY GUSTAFSON, DIANE THORKILDSON, SHANNON DRESSEL, ALAN

20  HERAK AND AMY GARLAND

21      78.   PLAINTIFFS hereby reference and incorporate all paragraphs of the allegations above

22  as though fully set forth herein.

23      79.   At the time that DEFENDANTS hired GAYLA as the Executive Director, she was

24  assured compensation at the rate of $46,000 per year, plus incentive bonuses and an IRA to induce

25  her into accepting the position.  The following inducements and continued actions included:

26      A.   Assurances made by AMPLIFY LIFE, through their Board of Directors at many

27  monthly meetings by which GAYLA raised the issues of failure to provide her the promised benefits.

28

OUELLETTE CIVIL COMPLAINT
Case No.

.      .

B.      Continued assurances that Herak would contact her to get her benefits into place.

C.      GAYLA had seen the Board of Directors take exceptionally long times to address other issues. Gayla knew other Amplify staffs were receiving an IRA and still others were informed and entitled to an IRA so that this behavior did not trigger the understanding that the Board did not intend to fulfill its promises to GAYLA.

D.      GAYLA was induced and accepted the position, and then continued to work in the understanding that she would be provided what was promised, including through the assurances in November 2019, when she was again induced to continue employment through new promises.

E.      When GAYLA was offered the Interim Executive Director position, and the Executive Director position, she was offered additional compensation and reassured as to her benefits.

F.      Each of these actions continued to actively hide their intention to defraud GAYLA, and to obtain her work.

80.      Upon information and belief Defendants never intended to provide these benefits to GAYLA as she was not aware that Defendants had no intention of honoring their promises and fully relied on their assurances that the bonuses and IRA were forthcoming.

81.      As a proximate result of the wrongful conduct of Defendants, and each of them GAYLA has suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.  In addition, the assurances kept GAYLA from pursuing other employment.

82.      As a proximate result of the wrongful conduct of Defendants, and each of them, GAYLA has suffered humiliation, emotional distress, and mental pain and anguish all to her damage in an amount according to proof at the time of trial.

83.      In doing the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously toward PLAINTIFF GAYLA with advance knowledge and conscious disregard of GAYLA's rights, or the consequences to her and neither authorized nor ratify such intentional, oppressive and malicious acts, with the intent of depriving GAYLA of property and legal rights and otherwise causing her injury. Because the acts taken toward GAYLA were carried out by directors,

officers, and/or managing agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage PLAINTIFFS that requests the imposition of punitive damages.

WHEREFORE, PLAINTIFF prays for relief as set forth below

## FOURTH CAUSE OF ACTION

(Defamation — PLAINTIFF GAYLA against AMPLIFY LIFE, STEPHANIE RICE, CYNDY GUSTAFSON, DIANE THORKILDSON, and SHANNON DRESSEL)

84.     PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein

85.     Defendants's Board of Directors represented to contractors, vendors, state employees, and the public via a Sparks Police Report, that GAYLA was terminated for insubordination, and communicated and implied that GAYLA embezzled funds from Amplify Life. The defamatory statements and their publication are false, as follows:

A.     A police report obtained, January 2019, using false claims, which is a public document makes claims of criminal behavior and misrepresents the true facts of her termination.

B.     An email to Pamela Macy dated July 25, 2019 claiming the problems and irregularities at Amplify Life are due to GAYLA communicated in bad faith and spite.

C.     The Board told Gerald Smith, Esq., Trustee of the Nell J. Redfield Foundation, a $63MM funder, who had funded Amplify Life, GAYLA had stolen Amplify Life grant files. This information was disseminated among GAYLA'S nonprofit industry colleagues. This caused irreparable damage to GAYLA'S reputation, career and ability to earn a living. It is reasonable to assume other funders, including, but not limited to, Pennington, E.L. Cord Foundation and the May and Stanley Smith Trust who GAYLA may also have been told the same.

D.     An email sent from Amplify Life on November 26, 2019 to Nick Ouellette disparaged his mother and PLAINTIFF, GAYLA.

86.     As the "Insubordination" claim is based on a forged document, the inclusion in the police report and the claims of embezzled funds are patently untrue and unprivileged.

OUELLETTE CIVIL COMPLAINT
Case No.

87.     At all times material the insubordination claim has permanently damaged GAYLA's ability to find equivalent or better level of employment.  At all times material to this action GAYLA's career and earning power has been destroyed.

88.     As a proximate result of the wrongful conduct of Defendants, and each of them, GAYLA has suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

89.     As a proximate result of the wrongful conduct of Defendants, and each of them PLAINTIFF GAYLA has suffered humiliation, emotional distress, and mental pain and anguish all to her damage in an amount according to proof at the time of trial.

90.     In doing the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously towards GAYLA with advance knowledge and conscious disregard of GAYLA's rights, or the consequences to her; or did she authorize or ratify such intentional, oppressive and malicious acts, with the intent of depriving her of her property and legal rights and otherwise causing her injury. Because the acts taken toward GAYLA were carried out by directors, officers, and/or managing agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage GAYLA therefore requests the assessment of punitive damages in an amount to punish the Defendants.

WHEREFORE, PLAINTIFF prays for relief as set forth below

### FIFTH CAUSE OF ACTION

(Conversion — PLAINTIFF LOREN against AMPLIFY LIFE, STEPHANIE RICE, CYNDY GUSTAFSON, DIANE THORKILDSON, and SHANNON DRESSEL)

91.     PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

92.     At all times material PLAINTIFF LOREN co-created a complex website for Defendants.  Under the agreement, LOREN retained custody of the hosting and website, programs, codes, data, scripts until the terms of the agreement were satisfied.  That included maintenance of the

OUELLETTE CIVIL COMPLAINT
Case No.

website.  The contract to do so has not been fully performed by AMPLIFY LIFE as they have failed to pay the full amount to LOREN with whom the contract was made.

93.     Defendants AMPLIFY LIFE, RICE, and GUSTAFSON converted the property by wrongfully gaining access to the host site and downloading all of the content and script that LOREN had co-created and managed.

94.     Defendants then created a new site to avoid paying the remaining balance under the contract.

95.     As a proximate result of the wrongful conduct of Defendants, and each of them, PLAINTIFF LOREN has incurred loss and damages in an amount according to proof at trial.

96.     As a proximate result of the wrongful conduct of Defendants, and each of them, LOREN has suffered humiliation, emotional distress, and mental pain and anguish all to his damage in an amount according to proof at the time of trial.

97.     In doing the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously towards LOREN with advance knowledge and conscious disregard of  LOREN's rights, or the consequences to him; or did authorize or ratify such intentional, oppressive and malicious acts, with the intent of depriving LOREN of property and legal rights and otherwise causing him injury. Because the acts taken toward LOREN were carried out by directors, officers, and/or managing agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage LOREN therefore requests the assessment of punitive damages in amount to be proven at trial.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

## SIXTH CAUSE OF ACTION

(Unjust Enrichment—PLAINTIFF LOREN Against AMPLIFY LIFE)

.     PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

98.     At all times material, Defendants have been unjustly enriched in two incidents by the work of LOREN, which are set forth herein, to wit:

OUELLETTE CIVIL COMPLAINT
Case No.

A.      Defendants approved LOREN OUELLETTE ('PLAINTIFF') to perform extensive work as an independent contractor for the benefit of Amplify Life from March of 2018 through December of 2018.  The work was related to the transition of the organization from the 1,400 sq. ft. Hubbard office to the 12,500 sq. ft. Galletti building located on the Northern Nevada Adult Mental Health Facility Campus at 480 Galletti Way, Sparks, Nevada.

B.      The work was conducted on a 24/7 basis in order to get the facility refurbished and up and running for the urgently needed programs and the grand opening.

C.      LOREN was initially provided with a small payment ($1,600.00) but was promised by Defendant Cyndy Gustufson and Board members that continuous payment was going to be arranged, to cover the work being done by LOREN.  Based on those assurances LOREN continued to work to refurbish the Defendants premises.

D.      Plaintiffs allege that Defendants owes Loren compensation for his labor and services.

E.      Defendants also wrongfully gained access to the hosting account and took the information, scripts, and content from the website co-created by LOREN without remuneration, and created another website to avoid paying the balance owed for the website program management agreement.

99.      As a proximate result of the wrongful conduct of Defendants, and each of them LOREN has suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.

100.      As a proximate result of the wrongful conduct of Defendants and each of them, PLAINTIFF LOREN has suffered humiliation, emotional distress, mental pain and anguish in damages in an amount according to proof at the time of trial.

101.      In perpetrating the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously towards LOREN with advance knowledge and conscious disregard of LOREN's rights, or the consequences to him; or did authorize or ratify such intentional, oppressive and malicious acts, with the intent of depriving LOREN of property and legal rights and otherwise causing him injury. Because the acts taken toward Plaintiff LOREN were caused by directors,

OUELLETTE CIVIL COMPLAINT
Case No.

officers, and/or managing agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage LOREN therefore requests the assessment of punitive damages.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

**SEVENTH CAUSE OF ACTION**

(Fraud and Deceit — GAYLA against Defendants AMPLIFY LIFE and STEPHANIE RICE)

102.    PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein

103.    GAYLA alleges the Amplify Life Board of Directors created a false document and forged GAYLA OUELLETTE's signature.  On January 23, 2019, GAYLA OUELLETTE, Executive Director of Special Recreation Services, Inc., dba Amplify Life, was terminated by the Board of Directors, in at least part with respect to the fraudulent document.

104.    GAYLA alleges prior to her termination, GAYLA made a formal email request for her employee file.  Since February 2015, GAYLA's employee file was in the possession of Stephanie Rice, Esq., Board director and located at Winter Street Law, formerly known as Hardy Law Group. It took numerous requests and weeks for Amplify Life to produce the employee file. GAYLA OUELLETTE had to go so far as to tell Stephanie Rice to "Stop playing games" and produce the file.

105.    On February 13, 2019, the requested file was delivered by courier from Stephanie Rice, Winter Street Law to Kerry Doyle, ESQ.  At the same time, the courier retrieved a box of Amplify Life property.  This property included the laptop computer available to Amplify Life on February 11, 2019.  It remained unclaimed for two days. However, Stephanie Rice stipulates, including in court documents, that these items were critical and not having them impeded the ability to run Amplify Life's business operations.

106.    On February 28, 2019 in the Doyle Law conference room, Kerry Doyle met with GAYLA OUELLETTE and together they opened the sealed envelope containing the employee file delivered by Stephanie Rice. When GAYLA received the file, it was unopened, sealed with tape, and signed over the seal by Stephanie Rice, Esq.  Photos of the envelope are available to demonstrate how it was sealed and signed.

OUELLETTE CIVIL COMPLAINT
Case No.

107.    PLAINTIFF GAYLA alleges that after she reviewed the contents of the file, she immediately took note of one document: SPECIAL RECREATION SERVICES, INC. EMPLOYEE CORRECTVIE ACTION FORM.  This document implicated GAYLA for concerns and violations related to her conduct as an Officer of the nonprofit.  It went on to bind GAYLA to certain conditions and terms.  Visibly absent from the employee file were GAYLA's stellar finalized Performance Reviews:  One from Stephanie Rice and William Wagner, 2016, and one from Cyndy Gustafson and William Wagner in 2017, which Kerry Doyle consequently requested from Anthony Hall, legal counsel to Amplify Life.  The request was never fulfilled.

108.    GAYLA alleges Kerry Doyle scanned the entire contents of the file and GAYLA left with the envelope. Ms. Doyle provided an affidavit supporting the authenticity of file.  Later that evening, GAYLA examined the document she questioned.  She determined the document to a fraud and forged for the following reasons and observations:

(a)    GAYLA's signature on the EMPLOYEE CORRECTIVE ACTION FORM is identical to her signature on the Conflict of Interest Policy, dated 5/31/13. GAYLA did in fact sign the Conflict of Interest Policy Form on her first day of employment with Camp Lotsafun (now known as Amplify Life),

(b)    The faint black spotted lines below GAYLA's signature are indicative of manipulation,

(c)    There is 'no date' next to GAYLA's signature. GAYLA alleges that she would never sign or fail to date a document,

(d)    The document is dated by Shannon Dressel, 12/9/2015 – A FULL TEN (10) MONTHS AFTER SHE RESIGNED FROM THE AMPLIFY LIFE BOARD OF DIECTORS,

(e)    GAYLA's length of employment stated in the upper left corner of the document is congruent with Ms. Dressel's date of 12/9/2015, written after her signature on the fraudulent document, and

(f)    The information specific to the "Concerns / Violations" is UNTRUE; The Neil J. Redfield Foundation never withheld funding during GAYLA's term of employment.

OUELLETTE CIVIL COMPLAINT
Case No.

109.    As a proximate result of the wrongful conduct, acts and omissions of the Defendants and each of them GAYLA has suffered and continues to sustain substantial losses in earnings and other employment benefits in an amount according to proof at the time of trial.  Specifically, due to the placement of the forged document in her file, GAYLA was wrongfully terminated.

110.    As a proximate result of the wrongful conduct of Defendants, and each of them, GAYLA has suffered humiliation, emotional distress, and mental pain and anguish in damages in an amount according to proof at the time of trial.

111.    In doing the acts herein alleged, Defendants acted intentionally, oppressively, and maliciously towards GAYLA with advance knowledge and conscious disregard of PLAINTIFFS rights, or the consequences to her; or did authorize or ratify such intentional, oppressive and malicious acts, with the intent of depriving GAYLA of her property and legal rights and otherwise causing her injury. Because the acts taken toward GAYLA were carried out by directors, officers, and/or managing agents acting in a deliberate, cold, callous, and intentional manner in order to injure and damage Plaintiff GAYLA  therefore requests the assessment of punitive damages.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

## EIGHTH CAUSE OF ACTION

(Violations of the Computer Fraud and Abuse Act, 18 USC § 1030 et. seq. by PLAINTIFF LOREN against Defendants CYNDY GUSTAFSON and STEPHANIE RICE)

112.    PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

113.    At all times material CYNDY GUSTAFSON wrongfully gaining access to the hosting account developed by LOREN without his authorization and consent.

114.    Upon gaining access to the hosting account developed by LOREN, CYNDY GUSTAFSON retrieved intellectual property owned by LOREN committing theft of his intellectual property by the unauthorized access to his computer.

OUELLETTE CIVIL COMPLAINT
Case No.

115.   Cyndy Gustafson violated Federal and State of Nevada computer crime statutes when she gained access to the Hosting account developed by LOREN without consent, licensing or written approval until the contract were fully paid.

116.   PLAINTIFF LOREN alleges as a result of the theft of his intellectual property committed by CYNDY GUSTAFSON and STEPHANIE RICE that he incurred damages in an amount according to proof at trial.

117.   On August 19, 2019 DEFENDANTS Amplify Life and its Board fraudulently gained unauthorized online access to GAYLA and LOREN'S Costco account and changed ownership and contact information in violation of 18 USC § 1030, et. seq.

118.   On August 20, 2019, DEFENDANTS GUSTAFSON and RICE an attorney, fraudulently gained unauthorized online access to GAYLA and LOREN'S Sam's Club Account and changed ownership and contact information in violation of 18 USC § 1030, et. seq.

WHEREFORE, PLAINTIFFS prays for relief as set forth below

### NINTH CAUSE OF ACTION

(Against all Defendants for Declaratory Relief)

119.   PLAINTIFFS hereby reference and incorporate all paragraphs of the above allegations in this Complaint as though fully set forth herein.

120.   An actual controversy has risen and now exists between the PLAINTIFFS on one hand and all named Defendants and organizations on the other hand regarding 501(c) (3) of the Internal Revenue Code requirements that a tax exempt organization must be organized and operated exclusively for exempt purposes and whether any of the named defendants violated its duty to public interests as opposed to the personal interests of board members, officers, directors and important employees.

121.   A judicial determination is required for a determination whether any of the Defendants violated the 501(c) (3) of the Internal Revenue Service maintaining its nonprofit status based on the above allegations and prohibited activities, including, but not limited to participating in, or intervening in any political campaigns on behalf of any person running for public office, including, but not limited to state court judges, politicians or lobbyists.

122. If any of the names defendants or organizations engaged in any improper conduct as defined by the Internal Revenue Service then the Court shall issue a declaratory judgment that all named defendants be liable for inurement and noncompliance subject to retroactive penalties as well as losing its non-profit status and retroactively penalized in accordance to Internal Revenue Code §501(c)(3).

WHEREFORE, PLAINTIFFS prays for relief as set forth below

## PRAYER FOR RELIEF

PLAINTIFFS seek relief as follows:

1. For general damages according to proof at the time of trial;
2. For special damages according to proof at the time of trial
3. For costs of the suit;
4. For punitive and exemplary damages as determined by the court;
5. For such other and further relief as the Court may deem proper.

## JURY DEMAND

**PLAINTIFFS respectfully demand a trial by jury on all issues so triable.**

DATED: JUNE 23, 2020

By: /s/ Loren R. Ouellette
Loren Ouellette
PLAINTIFF in Pro Per

By: /s/ Gayla E. Ouellette
Gayla Ouellette
PLAINTIFF in Pro Per

Page **27**

OUELLETTE CIVIL COMPLAINT
Case No.

**VERIFICATION**

I,   GAYLA OUELLETTE am the PLAINTIFF in the above entitled action.

Upon information and belief I avow that the facts herein are within my knowledge and to the contents thereof. The same is true of my knowledge, except as to those matters which are therein alleged on information and belief, and as to those matters are believed to be true.

I declare under penalty of perjury under the laws of the United States that the foregoing is true and correct and that this Verification was executed in Washoe County, California.


Dated: June 23, 2020                    /s/ Gayla Ouellette
                                        GAYLA OUELLETTE

OUELLETTE CIVIL COMPLAINT
Case No.